## KEY PHARMACEUTICALS, INC., Plaintiff,

v.

## MYLAN LABORATORIES INC., Mylan Pharmaceuticals Inc., Bertek, Inc. and Bertek Pharmaceuticals, Inc., Defendants.

No. Civ.A. 97–1462.

United States District Court, W.D. Pennsylvania.

Oct. 14, 1998.

James A. Mercolini, Edwin L. Klett, Klett Lieber Rooney & Schorling, Pittsburgh, PA, John O. Tramontine, Duane–David Hough, Thomas J. Vetter, Thomas P. Burke, Fish & Neave, New York City, for Plaintiff.

Gordon W. Schmidt, Doepken Keevican & Weiss, Pittsburgh, PA, E. Anthony Figg, Bart T. Newland, Steven Lieberman, Joseph A. Hynds, Elizabeth A. Leff, Rothwell Figg Ernst & Kurz, Washington, DC, for Defendants.

## MEMORANDUM ORDER

CINDRICH, District Judge.

Following plaintiff's opening argument in the non-jury trial of this case, the undersigned became aware that plaintiff is a wholly owned subsidiary of Schering–Plough Corporation ("Schering–Plough") and that I held stock in Schering–Plough. A check during the morning recess confirmed that I held 115 shares of Schering–Plough stock through my IRA account, and have owned such shares since May 15, 1998. My financial holdings in the form of stocks in my IRA account are handled by a professional investment management service and are not selected by me. These shares were acquired together with fifty-one other holdings when the management of my IRA account was transferred to the present investment manager on May 14, 1998. Upon receipt of the stock purchase confirmation in May, I examined all of my pending cases to discern any conflicts. *Key v. Mylan* was on the list, but I did not make the connection between Key and Schering–Plough, its parent.

To avoid just this situation, I obtain a daily report via Internet e-mail of the stocks in which the managers invest. Each day I and my secretary check the holdings against our list of pending cases.[1] While the papers filed by the parties undoubtedly have mentioned several times during the course of the suit that plaintiff was acquired by Schering–Plough, I did not connect the significance of those mentions with my stock holdings until this morning.

After identifying the problem, I held a conference with counsel to explain the situation and to give all parties and the court the opportunity to study the question of how to address this situation under 28 U.S.C. § 455 and relevant ethical rules.

■ Having examined that statute, case law, legislative history, and after consulting the Administrative Office of United States

---

1. Even when there is no change in the IRA or my private portfolio, the list must be checked because of the addition of new parties to existing cases. Given the three to four hundred pending cases and the multiplicity of parties, many of which are publicly held and have numerous affiliated entities, this is a daunting task. The lack of a local rule mandating disclosure similar to that required by the Federal Rules of Appellate procedure does not make the job easier. Our District Court Rules Committee (of which I am a member) is currently in the process of drafting a local rule requiring disclosure by counsel of affiliated entities.

Courts, the court believes the matter rests on the interpretation of 28 U.S.C. § 455(f). Section 455(b)(4) makes recusal mandatory when a judge "has a financial interest in . . . a party to the proceeding, or any other interest that could be substantially affected by the outcome of the proceeding."[2] Section 455(d)(4) defines "financial interest" in part as "ownership of a legal or equitable interest, however small." Section 455(f) provides an exception to this rigid scheme. It states:

(f) Notwithstanding the preceding provisions of this section, if any justice, judge, magistrate, or bankruptcy judge to whom a matter has been assigned would be disqualified, after substantial judicial time has been devoted to the matter, because of the appearance or discovery, after the matter was assigned to him or her, that he or she individually or as a fiduciary, or his or her spouse or minor child residing in his or her household, has a financial interest in a party (other than an interest that could be substantially affected by the outcome), disqualification is not required if the justice, judge, magistrate, bankruptcy judge, spouse or minor child, as the case may be, divests himself or herself of the interest that provides the grounds for the disqualification.

In applying this language to the current problem, it is first appropriate to find that the text of the provision indeed operates as an exception to mandatory recusal for financial interest in a party; otherwise it would have no meaning. The conditions for operation of section 455(f) are: (1) the devotion of substantial time to a case; (2) the discovery of a financial interest in a party; (3) the interest is one that could not be substantially affected by the outcome; and (4) divestment of the financial interest in question.

■■■ Making a finding on the first element is not difficult. This action was filed in August, 1997. The court has supervised exten-

sive discovery, entered case management and discovery orders, and conducted status and pretrial conferences. After reading exhaustive briefs in their entirety and appendices as necessary, I conducted a preliminary injunction hearing and made findings of fact and conclusions of law, all before the discovery of the connection between plaintiff and its parent. (It may be noteworthy that plaintiff's motion for preliminary injunction of defendant's alleged infringement of its patent was denied.) Plaintiff has obtained the declarations of experts from 17 different countries regarding the privileged status of documents it seeks to shield from discovery. The opening of trial has seen the appearance of at least six lawyers, other legal staff, and forty boxes of documents for *each* side. The parties have filed and the court has considered hundreds of pages of pretrial motions and briefs. In short, the court has devoted substantial time to the case.

In addition, it is apparent that the parties have devoted immense effort to preparation and trial of the case and my recusal would visit a great hardship on both sides. The plaintiff would lose the opportunity for a prompt hearing on its request for a permanent injunction and both would be forced to once again expend numerous hours in preparing themselves and their witnesses for trial.

The fourth element is likewise easily satisfied. On October 13, 1998, I instructed my portfolio manager to sell all my interests in Schering–Plough and the sale has been completed.

Proof of the finding on the second element of the test is not easy to identify or present. Suffice it to say that the record will reflect that the court made a record of the first time I connected the mention of Schering–Plough and the list of my IRA stocks, which contains over four dozen entries. Despite our efforts to match the stock list to pending cases on a

**2.** While the judge's financial interest at issue here is not, strictly speaking, in "a party to the proceeding", it is sufficiently close that it is governed by the mandatory recusal provisions of Section 455(b)(4). See Advisory Committee on Judicial Activities, Advisory Opinion No. 58, August 9, 1978 opining that under *Code of Judicial Conduct for United States Judges* and 28 U.S.C. Section 455, the owner of stock in a parent corporation has a direct legal or equitable interest in a controlled subsidiary and the judge should disqualify himself. Of course, as it relates to disqualification, this opinion must be read in light of the subsequent amendment of the statute by the addition of subsection (f).

daily basis, the connection between plaintiff and its parent was not made until October 13, 1998, the first day of trial, and that is the date of discovery.

The third element is a mixed question of fact and law that affords the court some discretion: how does one define the boundaries of a financial interest that is not substantially affected by the outcome? In deciding how to exercise this discretion, we looked to the legislative history of section 455(f). The committee report there confirms that section 455(f) was added specifically as a safety valve to avoid costly and inefficient disruption of cases when the financial interests at stake are de minimis. 1988 U.S.Code Cong. & Admin.News 5982, 6029–30. The committee's example of a case where recusal would not be called for was one where a judge's wife's ownership interest of at most $30 forced him to disqualify himself from a six year old class action case. The committee's example of a case where recusal would continue to be mandatory was where the financial interest is as a "significant stockholder in a closely held corporation with close acquaintances." *Id.* at 6030. This case falls somewhere in between, so the legislative history does not lead to a particular result.

The cases suggest a reading of section 455(f) as an exception that embodies a standard of reasonableness in determining the substantial effect of a case's outcome on a judge's financial interest. In *Baldwin Hardware Corp. v. Franksu Enterprise Corp.,* 78 F.3d 550 (Fed.Cir.1996), *cert. denied,* —— U.S. ——, 117 S.Ct. 360, 136 L.Ed.2d 251 (1996), the Federal Circuit upheld the denial of a recusal motion where the judge's mother owned stock in trust in the plaintiff's parent corporation, and the judge was a beneficiary of the trust. The trust sold the shares two months after the case was filed. The judge discovered the relationship between the plaintiff and the parent corporation after trial started, eighteen months after the com-

plaint was filed. The court found that section 455(f) "squarely fit[ ]" the circumstances. In *Kidder Peabody & Co. v. Maxus Energy Corp.,* 925 F.2d 556, 561 (2d Cir.1991), *cert. denied,* 501 U.S. 1218, 111 S.Ct. 2829, 115 L.Ed.2d 998 (1991), the Second Circuit found that divestiture of stock held by a judge's wife in a company whose subsidiary owned 80% of Kidder Peabody was sufficient to bring the judge within the exception, when the judge had the case for almost three years. In *Perpich v. Cleveland Cliffs Iron Co.,* 927 F.Supp. 226 (E.D.Mich.1996), the court denied a recusal motion where he was a limited partner in an entity that owned stock in two defendant corporations. The judge there divested himself of the limited partnership interest, and while he had not entered substantive orders on the case, had entered several scheduling and reference orders. He noted that while his time had been limited, the parties had spent substantial time on the case during its two year pendency. In *Tramonte v. Chrysler Corp.,* 136 F.3d 1025 (5th Cir.1998), the Fifth Circuit reviewed a denial of a recusal motion based on the judge's family member owning a car manufactured by defendant. This case carries little weight because of distinguishing facts, but in the survey of the few cases in the area, offers a brief analysis of the purpose of section 455(f). *Id.* at 1031–32.

Applying these teachings to the instant matter, the cost basis for the 151 shares was $10,185.18, comprising only a very small fraction of the total portfolio and any potential loss or gain related to the outcome of this case would be even smaller. Schering–Plough is a large, publicly held corporation with diverse interests and revenues in the billions. There is no reason to believe that whatever the outcome of this case involving one product line of one of its subsidiaries, my former financial interest in the parent would have been substantially affected or affected at all.[3]

**3.** Indeed, information available to us via the Internet from S & P's "Stock Quotes" and accompanying data does not suggest that the pendency of this litigation or the court's denial of Key's preliminary injunction request has had any affect on the trading value of its stock. The following information is provided by S & P. Schering–

Plough's 1997 net income was $1.913 billion on revenues of $6.778 billion. The first and second quarters of 1998 are ahead of 1997. The company is in the business of pharmaceuticals and health care with worldwide distribution of its products. Its products include prescription drugs, animal health, over-the-counter, foot-care

Indeed, we know from the facts already presented in this patent infringement case that the defendant entered the market with its alleged infringing product some time ago and according to the plaintiffs, resulted in a substantial loss of sales to Key. Yet, no one has suggested that the trading value of the stock in the parent corporation (the only interest I formerly owned) was affected by Mylan's entry into the market with its competing product. Accordingly, under the facts of this case, because the judge's ownership interest was in the parent corporation with diverse interests and revenues in the billions, the litigation involves only one of its subsidiaries and one of its product lines and no substantial affect on the value of the stock of the parent has been shown to be connected to the pendency or outcome of this case, I find that the third element of Section 455(f) has been satisfied. Accordingly, having found that the recusal would be mandatory but for the provisions of Section 455(f), which I find to have been satisfied, I will decline to recuse from this matter and we will proceed with the hearing on plaintiff's request for a final injunction.[4]

and sun care products. Its stock last traded for 97⅜, with a 52 week high of 108⅞ and a low of 51 which appears to have been in November, 1997. The 52 week chart indicates that the stock has steadily risen in value since November, 1997 and that its high was reached in September, 1998. On September 23, 1998, its board of directors declared a two for one stock split.

**4.** The financial information pertaining to Key was included in this opinion only to demonstrate

the lack of any reason to believe that the outcome of this litigation will have any substantial affect on the value of the shares formerly owned by the judge presiding over this matter and thus to trigger the exception under subsection (f). Nothing in this opinion has any bearing on the claimed infringement itself, the claimed damages suffered by Key due to the alleged infringement or its claimed loss of market share due to the entry of a lower priced competing product offered by Mylan.